UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
-------------------------------------------------X

MICHAEL DACORTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

-------------------------------------------------X

AMENDED NOTICE OF MOTION, AFFIRMATION, AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE CONVICTION PURSUANT TO 28 U.S.C. §2255

Docket No.: 8:25-cv-1992-WFJ-CPT

PLEASE TAKE NOTICE that upon the attached declaration of Stephen N. Preziosi , Esq., attorney for Michael DaCorta, dated September 2, 2025, the attached exhibits, and upon all of the prior pleadings and proceedings, the defendant Michael DaCorta will move this Court at the United States Courthouse for the Middle District of Florida, located at 801 North Florida Avenue, Tampa Florida at a date and time to be set by the Court for an order pursuant to 28 U.S.C. §2255, requesting that this Court set aside the conviction and sentence of Michael DaCorta and grant such other and further relief as the Court deems just and proper.

Dated: September 2, 2025
New York, New York

The Law Office of Stephen N. Preziosi
Stephen N. Preziosi, Esq.
48 Wall Street, 11th Floor
New York, New York 10005
212-960-8267
info@appealslawfirm.com
Attorney for Michael DaCorta

TO: United States Attorney for the Middle District of Florida

# TABLE OF CONTENTS

Amended Notice of Motion…………………..……………………………………………..……1

Amended Motion and Affirmation………………………………………………………..2

Preliminary Statement……………………………………………………………………….2

Statement of Timeliness……………………………………………………………………..2

Issues Presented……………….……………………………………………………………..3

Standard for Ineffective Assistance of Counsel Under the Sixth Amendment and Strickland v. Washington…………………………………..…………………………………………5

ARGUMENT AND MEMORANDUM OF LAW…………………………………………….6

POINT I

MR. DACORTA WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL WHEN HIS ATTORNEYS FAILED TO ARGUE THAT THE ATTORNEY-CLIENT PRIVILEGE COULD NOT BE WAIVED BY THE RECEIVER AND WHEN THEY FAILED TO ASSERT THE PERSONAL PRIVILEGE OF MR. DACORTA……………………………………………………………………..……………6

Defense Counsel Failed To Object To The Transfer Of The Receiver's Waiver Of Attorney-Client Privilege From The Civil Case To The Criminal Case………………………….………6

The facts of this case are distinguishable in a number of ways…………………………………...7

The language of the order appointing the receiver limits the authority to waive the attorney-client privilege to the pursuit of assets for the receivership……………………………………………..8

Defense Counsel Failed To Object To The Conflict Of Interest That Existed For The Receiver Whereby The Receiver Was Too Close In Identity To The Prosecuting Authority……………..9

Defense Counsel Failed to Object To Anile's Testimony That Violated The Personal Attorney-Client Privilege That Existed Between DaCorta And Anile……………………………………13

Defense Counsel Failed To Object To The Legal Conclusion/Opinion Testified To By Mr. Anile………………………………………………………………………………………17

The Failure To Object To All The Arguments Raised Under Point I Constitute Ineffective Assistance of Both Trial Counsel And Appellate Counsel Under The Sixth Amendment And Strickland v. Washington. ………………………………………………………………17

POINT II

MR. DACORTA WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL WHEN HIS ATTORNEYS FAILED TO OBJECT AT TRIAL AND RAISE ON APPEAL THE TESTIMONY OF RECEIVER BURTON WIAND……………………………………………………………………………………19

Mr. DaCorta Was Deprived Of Effective Assistance Of Counsel When His Trial Attorney Failed To Object To The Opinion Testimony Of The Receiver. ………………………………………20

Defense Counsel Failed To Object To The Receiver's Testimony That Introduced The Findings Of Another U.S. District Court That There Had Been Fraudulent Activity, Once Again, Usurping The Fact Finding Authority Of The Jury And Depriving Mr. DaCorta Of Effective Assistance Of Counsel. ……………………………………………………………………………………24

Mr. DaCorta Was Deprived Of Effective Assistance Of Counsel When His Trial Attorney Failed To Object To A The Confrontation Clause Violation In The Receiver's Testimony……………26

POINT III

MR. DACORTA WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO CALL AN EXPERT WITNES TO COUNTER THE TESTIMONY OF THE GOVERNMENT'S FOREX EXPERT……………..31

POINT IV

MR. DACORTA WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO OBJECT AND MOVE TO PRECLUDE RULE 404(b) MATERIAL ADMITTED INTO EVIDENCE BY THE GOVERNMENT……………………..33

Rule 404(b) And The Rule Against Admission of Other, Crimes, Wrongs, Acts………………..33

The 404(b) Testimony…………………………………………………………………………34

POINT V

MR. DACORTA WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO OBJECT OR MOVE TO SUPPRESS THE VIDEO EVIDENCE ILLEGALLY OBTAINED BY THE FBI DEPICTING A PRIVATE CHRISTMAS PARTY THAT TOOK PLACE ON PRIVATE PREMISES……………………36

CONCLUSION……………………………………………………………………………40

# TABLE OF AUTHORITIES

Cases

Berger v. New York, 388 U.S. 41 (1967)………………………………. ………………………37

Carpenter v. United States, 585 U.S. 296 (2018)…………………………………………..37

Commodity Futures Trading Com'n v. Weintraub, 471 U.S.343 (1985)……………. …………..7

Crawford v. Washington, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177………………27

Ferensic v. Birkett, 501 F.3d 469 (6th Cir. 2007)………………………… ………………31, 32

Gennusa v. Canova, 748 F.3d 1103 (11th Cir. 2014)……………………… …………………37

In re Grand Jury matter No. 91-01386, 969 F.2d 995, 998 (11th Cir. 1992)……………………14

Hinton v. Alabama, 571 U.S. 263, 273 (2014)…………………………………………….32

Johnson v Alabama, 256 F3d 1156, 1176 (11th Cir 2001)……………………………………6

Katz v. U.S., 389 U.S. 347 (1967)…………………………………………………...36, 37

Lundgren v. Mitchell, 440 F.3d 754, 774 (6th Cir. 2006)……………………………………18

Osley v. United States, 751 F.3d 1214 (11th Cir. 2014)…………………………………..6

Silverman v. United States, 365b U.S. 505 (1961)…………………………………………37

Smith v. Arizona, 602 U.S. 779 (2024)…………………………………………………27

Stermer v. Warren, 959 F.2d 704, 736-737 (6th Cir. 2020)……………………………..…18

Strickland v. Washington, 466 U.S. 668 (1984)………………………………….………3, 5, 6

U.S. v. Diaz-Arias, 717 F.3d 1 (1st Cir. 2013)…………………………………..……….21

U.S. v. Figueroa-Cruz, 914 F.Supp.2d 1250 (N.D. Ala. 2012)…………………….………37

United States v. Fulton, 837 F.3d 281 (2016)……………………………………………21

United States v. Glover, 872 F.3d 625 (2017)………………………………………...21

United States v. Goodman, 633 F.3d 963, 968-969 (10th Cir. 2011)……………………………..20

United States v. Jones, 565 U.S. 400 (2012)……………………………………………….37, 38

United States v. Leventhal, 961 F.2d 936, 940 (11th Cir. 1992)…………………………13, 14, 16

United States v. Nolan, 956 F.3d 71 (2nd Cir. 2020)……………………………………..………32

United States v. Sanmina Corp., 968 F.3d 1107, 1117 (9th Cir. 2020),……………………………8

United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991)……………………………13

United States v. Smirnoff, 382 F.Supp.3d 1278 (2019)……………………………………..………33

Weil v. Investment/Indicators, Research and Management, Inc., 647 F.2d 18, 24 (9th Cir. 1981)…………………….. ……………………………………………………………………8

Statutes

18 U.S.C. §2……………………………………………………………………………………..2

18 U.S.C. §1349…………………………………………………………………………………2

18 U.S.C. §1957………………………………………………………………………………….2

26 U.S.C. §7206………………………………………………………………………………….2

28 U.S.C. §2255……………………………………………………………………………….1, 3

FRE Rule 404…………………..……………………………………………………..33, 34, 36

FRE Rule 502……………………………………………………………………………………..7

FRE Rule 701…………………………………………………………………………..20, 21

FRE Rule 702……………………………………………………………………………………20

FRE Rule 704…………….………………………………………………………………………20

Const. Amend.

Sixth Amendment………………………………………………………………………6, 27, 28

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
-----------------------------------------------X

MICHAEL DACORTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

-----------------------------------------------X

AMENDED MOTION, AFFIRMATION, AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE CONVICTION PURSUANT TO 28 U.S.C. §2255

Docket No.: 8:25-cv-1992-WFJ-CPT

## PRELIMINARY STATEMENT

By Amended Motion dated September 2, 2025 Michael DaCorta seeks relief, pursuant to 28 U.S.C. §2255, on the grounds that his conviction was unconstitutionally obtained and his sentence was not compliant with Due Process. Mr. DaCorta is in the custody of the Bureau of Prisons in Sumterville, Florida at the Coleman Correctional Facility.

## STATEMENT OF TIMELINESS

Mr. DaCorta was convicted on three counts after trial before the Honorable William Jung upon a jury verdict on May 4, 2022 (Crim. Case No. 8:19-cr-605-WFJ-CPT): Count One conspiracy to commit wire fraud and mail fraud under 18 U.S.C. §1349, Count Two illegal monetary transactions under 18 U.S.C. §1957, and Count Three false and fraudulent statement on income tax return under 26 U.S.C. §7206(1) and 18 U.S.C. §2. On October 20, 2022, Mr. DaCorta was sentenced as follows: on Count One, he was sentenced to twenty years; on Count Two, he was sentenced to twenty years to run concurrently to Count One; and on Count Three, he was sentenced to 36 months to run consecutive to Counts One and Two.

Mr. DaCorta appealed to the Eleventh Circuit Court of Appeals (Case No. 22-13564). He argued four points on appeal: 1) The District Court erred in overruling the defense objection to a non-pattern jury instruction that instructed the jury that "and" means "or"; 2) The District Court erred in denying the motion to suppress statements taken at DaCorta's home; 3) The District Court erred in denying DaCorta's request for a jury instruction; 4) The District Court erred when it denied a motion for mistrial when a witness expressed an opinion about Mr. DaCorta's guilt.

In an unpublished opinion, the Eleventh Circuit affirmed the conviction on May 1, 2024. (See *United States v. DaCorta*, 22-13564, 2024 WL 1905330 (11th Cir. 2024). Although Mr. DaCorta had ninety days to seek review by the United States Supreme Court, he did not do so, and his appeal became final on July 30, 2024. Mr. DaCorta has one year from the date that his appeal became final to file a motion pursuant to 28 U.S.C. §2255. (See 28 U.S.C. §2255 (f)(1)).

Mr. DaCorta timely filed the 2255 motion with this Court on July 28, 2025. This Court ordered that the motion be stricken without prejudice and refiled as an amended motion by September 4, 2025 (See 8:25-cv-1992-WFJ-CPT Doc. #2). In a later order, this Court granted Mr. DaCorta permission to file an expanded motion of 40 pages, excluding tables and exhibits.

## ISSUES PRESENTED

Mr. DaCorta was deprived of effective assistance of both trial counsel and appellate counsel under the Sixth Amendment of the U.S. Const. and *Strickland v. Washington*, 466 U.S. 668 (1984). The issue of ineffective assistance of counsel was not raised on appeal. Mr. DaCorta was deprived of effective assistance of trial counsel and appellate counsel in the following instances:

1. When his attorneys failed to raise the issue of whether, under the District Court's order, a receiver could waive attorney-client privilege in a criminal case when the consent order, acquiesced to by Mr. DaCorta in a civil proceeding, was done solely for the purpose of enabling the receiver to retrieve assets of the corporation.

2. When his attorneys failed to raise the issue of the conflict of interest that existed for the receiver in waiving the attorney client privilege where 1) Mr. Anile, as argued by the Government, was not the attorney for the corporation; and 2) where the interests of the receiver were at odds with the interests of the corporation as the receiver is aligned most closely with the Government as prosecutor, and as the receiver readily admitted, a conviction in the criminal case would benefit the receivership.

3. When his attorneys failed to raise the issue of the scope of the waiver of attorney-client privilege consented to by Mr. DaCorta in the civil case and whether that waiver extended to the criminal case, which did not exist at the time Mr. DaCorta consented to the waiver.

4. When his attorneys failed to raise the issue of whether Mr. Anile was the attorney to Mr. DaCorta personally and whether the communications between them, which were admitted through the testimony of Mr. Anile at trial, were covered by personal attorney-client privilege between DaCorta and Anile.

5. When his attorneys failed to object at trial or raise the issue of the legal conclusions testified to by Joseph Anile at page 81 when he testified that DaCorta had committed felonies with him.

6. When his attorneys failed to object at trial or raise on appeal the opinion testimony of the receiver, Burton Wiand, who testified that Mr. DaCorta was running a fraudulent scheme,

that this was a Ponzi scheme, that another U.S. District Court Judge found that this was a Ponzi scheme, and that DaCorta had made fraudulent conveyances;

7. When his attorneys failed to object at trial or raise on appeal the testimony of the receiver, when he testified that he had confiscated assets of Oasis pursuant to an order of another U.S. District Court, which found there was fraud, usurping the fact finding authority of the jury.

8. When his attorneys failed to object at trial or raise on appeal the Confrontation Clause violation regarding the testimony of the receiver, who testified as to analysis, opinions and conclusions of an outside accounting firm regarding the books and records of Oasis, depriving DaCorta the right to confront the witnesses against him;

9. When his attorneys failed to object at trial or raise on appeal trial counsel's failure to call an expert witness in Forex trading to counter the government's expert witnesses.

10. When his trial attorney failed to object to the 404(b) testimony by 1) Ms. Oremland on 4/19/22 page 74 when the government introduced past allegations of fraud against Mr. DaCorta; 2) Ms. Sunu on 4/19/22 page 117-118 past allegations of disciplinary actions; 3) by Joseph Anile on 4/25/22 at page 126 where he alleged that Mr. DaCorta falsified accounts.

11. When his trial attorney failed to move, under the Fourth Amendment, to suppress the illegally obtained video statements and images of Mr. DaCorta recorded at an office Christmas party, which were illegally and covertly recorded by an FBI agent while trespassing at an invitation only private event.

<u>STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL</u>

12. The following standard for ineffective assistance of both trial counsel and appellate counsel under the Sixth Amendment of the U.S. Constitution and under the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984) is applicable to all the arguments presented below.

13. The Sixth Amendment of the U.S. Constitution enshrines the right to effective counsel. U.S. Const. amend. VI. An attorney provides ineffective assistance of counsel when his or her representation does not meet reasonable professional standards. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* outlines a two-prong test to determine an attorney's ineffectiveness. *Strickland*, 466 U.S. at 687. First, counsel's representation must fall below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687. Second, this ineffective performance must have prejudiced the defense. *Strickland*, 466 U.S. at 687.

14. This requires establishing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Osley v United States*, 751 F3d 1214, 1222 (11th Cir 2014).

15. The well-known standard for ineffective assistance of counsel articulated in *Strickland* applies to appellate proceedings as well as trial proceedings. *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001). The *Strickland* standard as outlined here is applicable to all the arguments that follow.

ARGUMENT AND MEMORANDUM OF LAW

POINT I

MR. DACORTA WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL WHEN HIS ATTORNEYS FAILED TO ARGUE THAT THE ATTORNEY-CLIENT PRIVILEGE COULD NOT BE WAIVED BY THE RECEIVER AND WHEN THEY FAILED TO ASSERT THE PERSONAL PRIVILEGE OF MR. DACORTA.

*Defense Counsel Failed To Object To The Transfer Of The Receiver's Waiver Of Attorney-Client Privilege From The Civil Case To The Criminal Case*.

16. A civil proceeding had been commenced against Mr. DaCorta on April 15, 2019. (*See Commodities Futures Trading Comm. v. Oasis Int'l Grp., Ltd. et al.*, Case No. 8:19-cv-886-VMC-SPR, Doc. # 1, hereinafter "the "CFTC Action." DaCorta signed a consent (CFTC Action

Doc. # 35-3) to entry of the order of the District Court in the civil proceeding, which bestowed upon the receiver the right to waive attorney-client privilege on behalf of the corporation for limited purposes. (CFTC Action Doc. #44).

17. At the pre-trial hearing and at trial, defense counsel failed to argue that relinquishing the right to waive attorney-client privilege in a civil proceeding for the purpose of pursuing claims should not transfer to and be applicable in a criminal proceeding.

18. The parties relied on *Commodity Futures trading Com'n v. Weintraub*, 471 U.S. 343 (1985) to assert that the receiver had the right to waive the attorney-client privilege in a criminal case. In that case, the Supreme Court held that where the CFTC filed a petition against a corporation and on that same day the sole director of the corporation consented to the appointment of a receiver and consented to the receiver filing a petition for bankruptcy.

*The Facts Of This Case Are Distinguishable From Weintraub*.

19. When DaCorta signed the consent to the entry of the order appointing the receiver in CFTC action (See CFTC Action Doc. 44), the criminal action against DaCorta had not yet been commenced. That action commenced in December of 2019. Conversely, in *Weintraub*, both the consent signed by the defendant encompassed both the appointment of the receiver and the filing of the bankruptcy petition.

20. The waiver of attorney-client privilege must be intentional, and the scope of the waiver is limited to certain subject matter. See FRE Rule 502(a)(1) and (a)(2).

21. Under FRE Rule 502(a) it states *When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed*

*communications or information concern the same subject matter; and (3) they ought in fairness to be considered together*.

22. DaCorta's consent to the entry of the order in the CFTC Action was intentional only within the scope of the language of that Order. (CFTC Action Doc. 44). The waiver applies only to the proceedings that the receiver might pursue for the purpose of regaining assets for the receivership. It did not apply to a criminal proceeding.

23. It is impossible to interpret DaCorta's consent as an intentional waiving of the privilege as is required under FRE Rule 502(a) in the criminal context because there was no criminal case at the time.

*The Language Of The Order Appointing The Receiver Limits The Authority To Waive The Attorney Client Privilege To The Pursuit Of Assets For The Receivership*.

24. The order appointing the receiver limits the power to waive the attorney-client privilege to the context of his pursuit of claims for the receivership.

25. In *United States v. Sanmina Corp.*, 968 F.3d 1107, 1117 (9th Cir. 2020), the Court addressed the concept of subject matter waiver of the attorney-client privilege. It was held that under the subject matter waiver, disclosure of information resulting in the waiver of the attorney-client privilege constitutes waiver only as to communications about the matter actually disclosed. See also *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) holding that voluntary disclosure of the content of a privileged attorney communication constitutes waiver as to communications on the same subject.

26. Here, the language in the order authorizing the receiver to waive the privilege is contained in a section of the order entitled "Investigate and Prosecute Claims." (CFTC Action Doc. 44 pages 16-17).

27. Even if DaCorta were aware that he was signing away the authority to waive attorney-client privilege, which is unlikely given the complexity of the 22 page document, he would have believed that the authority to waive the privilege was applicable only in situations where the receiver was pursuing assets to be taken into the receivership.

28. In fact, there is no language within the order appointing the receiver, express or implied, that authorizes the receiver to waive attorney-client privilege in a criminal proceeding.

*Defense Counsel Failed To Object To The Conflict Of Interest That Existed For The Receiver Whereby The Receiver Was The Alter Ego Of The Prosecuting Authority*.

29. Defense counsel failed to argue that the receiver was too closely associated and was a parallel legal identity to the Government. The authority to waive attorney-client privilege in the context of a criminal case violated the Due Process right to a fair trial.

30. The actions and testimony of the receiver demonstrated that he was the alter ego of the prosecuting authority. He accompanied the FBI and CFTC to DaCorta's house and took possession of DaCorta's assets. (TT.194 at 4/27/22)[1]; he testified against DaCorta in the pre-trial criminal proceedings (See transcripts of Evidentiary Hearing on June 15, 2021); he testified against DaCorta at the criminal trial (See transcripts of Criminal Trial on April 27, 2022); he provided affidavits to the CFTC in their motions for summary judgment in the civil action (See CFTC Action Doc. 165-1); he brought legal actions against each and every one of DaCorta's attorneys, thwarting DaCorta's ability to retain adequate representation.

31. Not only was the receiver the alter ego of the prosecution of DaCorta, but the prosecution and conviction of DaCorta also benefits the receiver personally. He has billed millions of dollars to the receivership in exchange for his testimony and actions against DaCorta. (TT.237)

[1] TT numbers refer to trial transcripts followed by page number.

As of the date of trial, the receiver had billed $2.4 million to the receivership. It is believed that as of the writing of this motion, the receiver has billed in excess of $3 million in attorney and expert fees, all for services provided to the prosecuting authority.

32. Permitting the receiver to possess the authority to waive attorney-client privilege in the context of a criminal case recasts the waiver into a cudgel for the Government to thrash DaCorta's Due Process right to a fair trial.

*Defense Counsel Failed To Object Or Assert That Mr. Anile Was Personal Counsel To Mr. DaCorta And The Receiver Had No Right To Waive The Attorney-Client Privilege That Existed Between DaCorta As An Individual And Mr. Anile As His Counsel*.

33. Mr. DaCorta and Mr. Anile had a long history as attorney and client before Oasis.

34. Anile and DaCorta met in the mid 1990s and there was an extensive history of DaCorta seeking the legal counsel from Mr. Anile.

35. In the mid 1990s DaCorta sought out Anile to do a securities offering:

> Q Before we get into that, prior to this time, had you been acquainted with Mr. DaCorta?
> A A mutual friend, I don't know who, introduced us in the mid '90s. I was a lawyer, and Michael was introduced to me to help him. He had a company and he was trying to raise capital for the company, corporate finance. And he hired me as an attorney to do a securities offering which would be exempt from registration pursuant to the Securities and Exchange Commission rules.
> Q And so you had done some legal work for Mr. DaCorta previously?
> A Yes.
> (T.89 at 4/25/22)

36. Sometime in the early 1990s, Mr. DaCorta again consulted Mr. Anile as attorney to assist in raising funds for a brewing company called Empire State Brewing:

> Q Who did you call to seek legal advice?
> A That would be Joseph Anile.
> Q How did you come to learn about Joseph Anile?
> A I was with an investment firm who was interested in taking a look at the beer brand. And they had recommended that I call him because I told them, you know, what I was planning on doing, and they told me that he would be the type of attorney I would need.

(T.210 at 4/29/22)

37. In 2008, DaCorta hired Mr. Anile to file for bankruptcy:

> Q Did you hire an attorney to assist you in that bankruptcy?
> A I did.
> Q And who did you hire?
> A Well, at first I called Mr. Anile again and I asked him his advice.
> Q Let me stop you right there. You mentioned that you called Mr. Anile. There had been some time since you had spoken to him, had it not?
> A No. He actually sets up -- yeah. He sets up -- he set up ICT and the DaCorta Group in 2002 for me.
> Q Did Mr. Anile represent you in the bankruptcy?
> A No.
> (T.225-226 at 4/29/22).

38. Again, in the early 2000s, DaCorta hired Anile to set up a company named ICT:

Q Before we get to the agreement, why Joe Anile?
A Joe Anile had set up ICT. And Joe was probably at that time someone that I knew of that was one of the best corporate and financial attorneys that I knew.
(T.239-240 at 4/29/22).

39. In 2012, DaCorta hired Anile as his attorney to assist in creating a hedge fund:

Q Did Mr. DaCorta ask you to do any other work for him?
A We were anticipating that answer, the answer that you see here, the denial of the claim. So Michael suggested that I help set up a hedge fund.
(T.93 at 4/25/22)

40. In 2015 DaCorta consulted with Anile to set up Oasis. DaCorta testified about his relationship with Anile:

Q Was he someone that you trusted?
A Oh, absolutely.
Q Did you rely on his counsel, his advice that he was giving you regarding the NFA informal agreement?
A Absolutely, 100 percent.

41. DaCorta trusted Anile as his counsel. He asked him to be partner in the new business venture and counsel for DaCorta and the corporation.:

Q In brainstorming the company that you wanted to form, how did you envision your role in this new company?

> A Well, I envisioned that I would take care of the investment end of it, Joe would take care of the legal end of it, and Ray would take care of the marketing end of it.
> (T.244 at 4/29/22)

42. Mr. Anile had been Mr. DaCorta's go-to attorney for at least 20 years before Oasis was formed. DaCorta went to Anile with every legal issue even when DaCorta's daughter had some personal problem in school and needed legal advice and counsel, DaCorta went to Mr. Anile.

43. While Anile testified that he was not the attorney for the corporation and the Government insisted the same, Mr. Anile was collecting an annual salary at Oasis of over $200,000 plus a rent-free house. His total compensation package was close to $250,000.00 per year.

44. Anile worked his entire career as an attorney at law firms in New York City. See transcripts pgs. 76-78 on April 25, 2022 Anile testified his singular skill was as an attorney.

45. At Oasis, Anile didn't participate in trading for Oasis; he didn't do sales; he didn't do marketing; he didn't do bookkeeping or accounting; he did not interview or recruit employees.

46. Why was Joseph Anile being compensated in the range of $250,000 per year to work at Oasis?

47. While Anile vociferously denied being the attorney for Oasis, it is more than curious that Anile never testified as to precisely what he did at Oasis. There was no testimony as to what his daily tasks were or what his responsibilities were.

48. Anile was asked to be part of Oasis, and he worked at Oasis providing legal counsel of all types. Much like an in-house counsel, Anile sought out and hired other attorneys for Oasis. (See TT.89 at 4/25/22; T. 97 at 4/25/22; TT.103 at 4/25/22; T.104 at 4/25/22); he handled the attorney's trust account for OIG (TT.144 at 4/25/22); he handled contracts for Oasis (TT.113 at 4/25/22; TT.213 at 4/25/22; TT.261 at 4/25/22).

49. Most importantly, DaCorta went to Anile with any and all legal issues whether personal or corporate. During a pre-trial hearing, the fact that DaCorta went to Anile seeking advice regarding an issue that his daughter was having in college is highly indicative that DaCorta viewed Anile as his personal counselor.

*Defense Counsel Failed to Object To Anile's Testimony That Violated The Personal Attorney-Client Privilege That Existed Between DaCorta And Anile*.

50. At trial, Anile testified about two private conversations he had with Mr. DaCorta. Both of the conversations fell within DaCorta's personal attorney-client privilege and were not covered by any waiver of the privilege by the receiver. The nature of the communications and the circumstances under which DaCorta communicated with Anile indicate that this was a privileged communication where DaCorta was seeking confidential legal counsel.

51. The attorney-client privilege protects certain communications between a client and their attorney and is designed to encourage open and honest communication.

52. The party invoking the attorney client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential. *United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991). To show that a communication is privileged, it must be made confidentially, in a professional capacity, for the purpose of securing legal advice. The key question is whether the client reasonably understood the conference to be confidential. See *Schaltenbrand*, *supra*.

53. The Eleventh Circuit has consistently held that the incriminating nature of the communication may create in the client a reasonable expectation of confidentiality. *United States v. Leventhal*, 961 F.2d 936, 940 (11th Cir. 1992). Referred to as the "last link" doctrine, it extends the attorney-client privilege to non-privileged information when the incriminating nature is

indicative of the professional relationship. *In re Grand Jury matter No. 91-01386*, 969 F.2d 995, 998 (11th Cir. 1992); *United States v. Leventhal*, 961 F.2d 936, 940 (11th Cir. 1992).

54. In both encounters, DaCorta met with Anile covertly, one on one – a powerful indicator of an attorney-client communication:

> Q During this same trip in or about February 2017, did you meet with the defendant?
> A Yes.
> Q What happened?
> A The morning following my arrival, he rang the bell and he asked if I would go for a walk and I did. Ostensibly it was to show me the block and the neighborhood. We were just chatting. And as we were walking, he informed me that he had suffered a trading loss.
> Q He had suffered what?
> A A trading loss.
> Q Did he say how much?
> A Yes.
> Q How much?
> A He said he lost $4 million.
> Q How did you respond?
> A There had been red flags as to the possibility of losses. So his saying it to me was a little bit of a relief because I realized there would be losses and I thought they were far less than I would have thought. And I said, well, okay, we can get the partners together, meaning myself, Mike, and Ray and we can perhaps borrow the money from our own families and friends and then just shut down that aspect of the business, and we had other things going on that were very good that we could have continued with.
> Q Did the defendant agree with that proposal?
> A No.
> Q What did he say?
> A He said that would not be necessary, that we didn't have to tell Ray or anything about it, that he had it covered.
> Q Did he say what he meant by "he had it covered"?
> A Yes.
> Q What did he say?
> A He had a very specific plan of trading, and it wouldn't happen quickly. It would happen over a period of months, but he would be able to go in and out of the market and basically make up the deficit which he then referred to as a gap, a trading gap.
> Q Did you two discuss disclosing this gap to the investors?
> A No. We agreed not to discuss it with anyone.
> (T.171-173 at 4/25/22)

55. DaCorta went to see Anile at Anile's home. They went for a walk to maintain privacy. DaCorta confessed that there had been losses, that he didn't want the other partner, Ray Montie, to know. They kept the facts and the conversation outside the office, and they did not convey this information to anyone else at the direction of DaCorta.

56. The setting of the conversation, the nature of the information that DaCorta conveyed to Anile, and DaCorta's direction that the information should not be shared with anyone, even their own partner, are all factors that are indicative of the personal attorney-client relationship.

57. Anile testified as to another private conversation he had with DaCorta. In late 2018, DaCorta went to Anile's home and confessed to him, while they sat by the pool alone, that there had been more trading losses.

> Q At some point in later 2018, did you have a discussion with the defendant about the trading?
> A Yes.
> Q When?
> A Around August of '18.
> Q What did the defendant tell you?
> A Michael came to my home and we sat out by the pool and he said he had significant losses, between seven and a half and $15 million. He didn't know the amount.
> Q How much money did he say he had lost?
> A Seven and a half to $15 million.
> Q From the FX trading, the forex trading?
> A It wasn't clear to me what the total losses were an aggregate of.
> Q How did you respond to that statement?
> A I was overwhelmed. I said, this is clearly a Ponzi scheme. He said, yes, I know. And I said, well, we need to get our arms around this. And we agreed to hire an accountant who would come in and audit everything and look at all the books and records. And we wouldn't tell anyone until we had real information what we would say.
> Q You wouldn't tell anyone you didn't have real information. What do you mean?
> A Right. We didn't know -- we didn't know what the losses were, if they were accurate. That's correct. It was too much of a variable to say that number. And the company had assets that maybe had to be recalculated for fair market value. It was just we did not have a handle on the losses. Seven and a half to $15 million is not

> an accurate statement. And we agreed not to say anything and have an accountant calculate them.
> (TT.198-199 4/25/22)

58. This conversation was held outside the corporate setting; at Anile's home, one on one, by the pool as DaCorta confessed trading losses. The setting is indicative of the confidential nature of the communication. The incriminating content is indicative of the personal attorney-client relationship. See *United States v. Leventhal*, 961 F.2d at 940.

59. If Anile's testimony is to be taken as truthful, DaCorta confessed to running a Ponzi scheme, i.e. he confessed to a criminal act. This is not the statement of a corporate officer seeking the advice of in-house counsel or a discussion of business strategy.

60. DaCorta went to Anile seeking legal advice on the alleged crime. The location and setting of the communication and the incriminating nature of the information DaCorta shared is indicative of the confidential nature that was intended. The overall context of the communication established a personal attorney-client relationship between DaCorta and Anile.

61. Moreover, DaCorta seeking out Anile for legal advice is consistent with their shared histories. DaCorta had been seeking legal advice from Anile as his personal attorney for more than two decades.

62. Most importantly, the privilege established in these conversations was a personal privilege between DaCorta and Anile. It was not part of or encompassed by the waiver possessed by the receiver. The privilege in these communications could only be waived by DaCorta himself.

63. Defense counsel failed to make any objection to preserve the right to the privileged communications between Mr. DaCorta and his attorney. That failure falls below an objectively reasonable standard. There can be no doubt that Anile's testimony regarding these two conversations was fatal to the defense at trial.

*<u>Defense Counsel Failed To Object To The Legal Conclusion/Opinion Testified To By Mr. Anile</u>*

64. Defense counsel failed to object to the testimony of Mr. Anile constituting a legal conclusion. The Government asked Mr. Anile on direct whether he had ever committed a federal felony offense. Anile admitted that had already pleaded guilty to several counts and was awaiting sentence.

65. However, the Government then asked Anile to make a legal conclusion:

> Q Now, Mr. Anile, have you ever committed a federal felony offense?
> A Yes.
> Q What federal felonies have you committed?
> A Conspiracy, money laundering, and filing a false tax
> return.
> Q Do you see anyone in this courtroom who participated in that conduct with
> you?
> A Yes.
> Q Could you please identify the person to whom you are referring by pointing
> him or her out and describing what they are wearing?
> A Of course. Mr. DaCorta seated here wearing a brownish blazer, blue shirt, and
> blue silver tie.
> (T.81 at 4/25/22)

66. Defense counsel should have objected to this legal conclusion and Anile's opinion. Anile was not an expert and should not have been permitted to testify to a legal conclusion and offer his opinion to the jury. (See FRE Rules 701 and 702).

*<u>The Failure To Object To All The Arguments Raised Under Point I Constitute Ineffective Assistance of Both Trial Counsel And Appellate Counsel Under The Sixth Amendment And Strickland v. Washington</u>*.

67. The failure to object to the grounds raised under this point were a departure from professional norms and resulted in prejudice to Mr. DaCorta, depriving him of effective assistance of counsel.

68. Defense counsel's failure to object can constitute ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), when such failure meets the two-pronged

test established by the Supreme Court: (1) the performance prong, requiring that counsel's performance fell below an objective standard of reasonableness, and (2) the prejudice prong, requiring that the deficient performance prejudiced the defense.

69. At the pre-trial hearing concerning Anile's testimony, it was decided that the receiver had the authority to waive the attorney-client privilege on behalf of the corporation only, and that DaCorta retained the right to the personal attorney-client privilege and that right was his alone to waive. In its order, the Court stated that it would decide at a time closer to trial whether there were any protectible attorney-client communications between DaCorta and Anile. (See Doc. 103).

70. Defense counsel never revisited the issue, and no objection was ever made.

71. In *Stermer v. Warren*, 959 F.2d 704, 736-737 (6th Cir. 2020), the court found that the admission of certain statements by the prosecution in closing arguments were so highly prejudicial that there was no way that the attorney's failure to object might be considered sound trial strategy. *Stermer* at 737. There, trial counsel stood by while the prosecutor repeatedly branded Stermer a liar, misrepresented her statements, bolstered the credibility of other witnesses, and called her a "diabolical, scheming, manipulative liar and a murderer." While "any single failure to object usually cannot be said to have been error," defense counsel "so consistently failed to use objections that counsel's failure cannot reasonably have been said to have been part of a trial strategy." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006) (applying the *Strickland* test for ineffective assistance); *Stermer v Warren*, 959 F3d 704, 737 [6th Cir 2020].

72. The holding and rationale in *Stermer* are applicable here. The prejudice that inured to Mr. DaCorta that stems from waiver in the civil case permitted the testimony of Anile, including the incriminating conversations between DaCorta and Anile and an alleged admission to running

a Ponzi scheme. This testimony was direct proof of one of the elements of the crimes in the indictment, and it could not have been more prejudicial to Mr. DaCorta to have his personal counsel testify to their confidential conversations.

73. Second, there is no case law that permits a receiver who was authorized in a civil proceeding to then waive attorney-client privilege in a criminal proceeding. The scope of the receiver's authority is immediately apparent within the context of the order appointing the receiver in the CFTC Action. There is no logical strategy to permit the receiver to exercise this unsanctioned power for the admission of evidence at Mr. DaCorta's criminal trial.

74. More importantly, the Government asserted that Mr. Anile was not the attorney for Oasis, and Anile denied being the attorney for Oasis. It was never asked who the "attorney" was in the receiver's waiver of attorney-client privilege. To which attorney is the receiver's waiver applicable? And what is the scope of information that the receiver's waiver would allow? These objections were never made, and questions were never asked by defense counsel.

75. Third, the issue of the personal attorney-client privilege had been raised at a pre-trial hearing where the trial court stated that it would entertain argument on this subject closer to trial. Defense counsel had an obligation to either find out what statements Anile would testify to or make the appropriate objection at trial. The two highly incriminating conversations were admitted at trial without objection or assertion of DaCorta's personal attorney-client privilege.

## POINT II

## MR. DACORTA WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL WHEN HIS ATTORNEYS FAILED TO OBJECT AT TRIAL AND RAISE ON APPEAL THE TESTIMONY OF RECEIVER BURTON WIAND.

76. Mr. DaCorta's trial attorney failed to object to the testimony of the receiver at his criminal trial on the following grounds: 1) he failed to object to the opinion testimony of the

receiver regarding the nature of Oasis; 2) he failed to object when the receiver testified to the fact that another U.S. District Court found that Mr. DaCorta and Oasis had committed fraud; 3) he failed to object when the receiver testified that he confiscated all the assets of Oasis and Mr. DaCorta pursuant to a finding of fraud by another U.S. District Court; 4) he failed to object when the receiver committed a Confrontation Clause violation and testified to the expert findings and opinions of an accounting firm that were not his own findings and conclusions; 5) Most importantly, there was no objection to the relevance of the receiver's testimony because it did not touch upon any proof of the elements of the crimes alleged against Mr. DaCorta.

*Mr. DaCorta Was Deprived Of Effective Assistance Of Counsel When His Trial Attorney Failed To Object To The Opinion Testimony Of The Receiver*.

77. The receiver offered his opinion about the activities of Mr. DaCorta and Oasis that went directly to the ultimate issue to be decided. He stated that the financial activities of Oasis were fraudulent conveyances, that Mr. DaCorta was running a Ponzi scheme, and that DaCorta had committed acts of fraud. Defense counsel made no objection.

78. Under FRE Rule 702, an expert witness may give testimony in the form of an opinion. However, the receiver was not an expert. Even the testimony of expert witnesses is confined by Rule 704(b), which states in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone. *United States v. Goodman*, 633 F.3d 963, 968-969 (10th Cir. 2011).

79. The receiver's testimony was not admissible as lay-opinion testimony under FRE Rule 701. In order for it to be admissible under Rule 701 it must not be based on scientific, technical, or other specialized knowledge under Rule 702. Wiand testified he relied on numerous experts.

80. He hired the Kapila accounting firm to go through all the financial records of Oasis to verify the money that came in and out of the company (TT.217 at 4/27/22); he hired retail marketing agents to market the real estate (TT.223 at 4/27/22); he hired an IT consulting firm called E-Hounds, experts in forensics (TT.211 at 4/27/22). He was not an expert and under 701 he may not offer opinion testimony by merely regurgitating the opinion of the experts he hired.

81. Courts have repeatedly warned against lay opinion testimony that risks usurping the jury's role as the ultimate fact-finder. In *United States v. Fulton*, the Third Circuit noted that while Rule 704(a) permits ultimate issue testimony, such testimony is inadmissible if its primary value is to dictate a conclusion to the jury. *United States v. Fulton*, 837 F.3d 281 (2016). Similarly, in *United States v. Diaz-Arias*, the First Circuit highlighted that lay opinions on ultimate issues rarely meet Rule 701(b)'s helpfulness requirement because the jury is equally capable of drawing conclusions. *U.S. v. Diaz-Arias*, 717 F.3d 1 (1st Cir. 2013).

82. Under *Strickland*, defense counsel's failure to object to improper lay opinion testimony can constitute deficient performance if the testimony violates evidentiary rules and prejudices the defendant. In *United States v. Glover*, the D.C. Circuit found that defense counsel performed below constitutional standards by failing to challenge lay opinion testimony interpreting recorded statements. The court emphasized that Rule 701 requires lay opinions to be rationally based on the witness's perception and helpful to the jury. Counsel's failure to object to this testimony at trial and on appeal was deficient. *United States v. Glover*, 872 F.3d 625 (2017).

83. The receiver testified as to his opinion that went directly to the ultimate issue.

> Q Mr. Wiand, were you also charged with evaluating the Oasis entities themselves?
> A I was, absolutely.
> Q For what purpose?
> A Well, when a receiver is appointed in this kind of case, you might think that should be the case, but the receiver's job is not to go in and say, okay, I'm a

> liquidator. The receiver's job is to go in and look at the business and see should this thing be liquidated or is this thing something that can live. And so I need to, as part of my task, do an evaluation based upon the records of the business and the information I gathered to determine whether or not it was a viable business. And I did that with respect to the Oasis entities.
> Q And what was your determination?
> A My determination was that the Oasis entities was not a viable business, and indeed it was a Ponzi scheme.
> (TT.232-233 at 4/27/22)

84. Whether there was a Ponzi scheme was Wiand's opinion, which usurped the jury's fact finding authority. FRE Rule 704(b).

85. Mr. Wiand offered other opinions:

> Q Did you institute any legal action, civil legal actions in connection with your duties as receiver?
> A Yeah. I instituted a number of legal actions. As part of being a receiver, you look for assets of the receivership. And claims against third parties are assets of the receivership. So I bring claims in order to get more money into the receivership. Examples in this case are I have instituted a claim against Mr. Montie who was one of the three partners in Oasis because we had claimed that he had breached his fiduciary duties to the company. I have instituted a claim against Fund Administration or Mainstream that was the -- they did – as Fund Administration, they issued the checks, they received the money in. And based upon what they saw with respect to money coming in and going out, knowing that this was an investment company and never receiving any money from any investments, we charged that they had knowledge that this was a scheme, an investment scheme…
> (TT.233-234 at 4/27/22)

86. The testimony that this was an investment scheme was Mr. Wiand's opinion as to the ultimate issue. Defense counsel objected on grounds of foundation and relevance but never to the lay opinion that was directed at the ultimate issue.

87. The receiver offered further opinion:

> MR. WIAND: We also instituted lawsuits that involved -- I don't have the exact number -- but a hundred people who are – what is known as claw back lawsuits. And in a receivership, I'm obligated to go out and seek the return of any monies that are owed to the receivership. If an individual invests in one of these schemes and --
> MR. ALLEN: Objection. 403.
> THE COURT: Well, overruled.

A -- they receive back more money than they invested, the law says that that additional money that they received is what's called a fraudulent conveyance, and I am entitled to seek the return of that money.
(TT.235 at 4/27/22)

88. The testimony that this was a fraudulent conveyance and what the law says is opinion.

89. The receiver continued to offer opinion testimony:

Q Because you don't know what the future is going to hold regarding the market?
A That is not my job.
Q Correct.
A And this was not -- this was a Ponzi -- I mean, this was a forex scheme. It was not involved with -- it wasn't a REIT. It wasn't a real estate investment trust.
Q Well, there has been no finding in either the criminal matter or the civil matter that this was a forex scheme; isn't that correct? Judicial finding by a jury in either matter, correct?
A I don't think a jury has found that, but I think you might find in some of Judge Covington's orders that the evidence presented to her, she made the determination that it was a Ponzi scheme.
Q Preliminary matters, correct?
A They were -- as the motions went forward in the proceeding, I think she has made that determination but, you know, it is not a final end judgment against Mr. DaCorta, no.
(TT.269 at 4/27/22)

---

Q Okay. There has been no finding of guilt or innocence as to the allegations that are lodged against Mr. DaCorta as to whether or not he was involved in a scheme to defraud, correct? You don't get to decide whether or not Mr. DaCorta is guilty of a scheme to defraud, do you?
A It's incumbent upon me in making my decisions as a receiver to determine whether or not this was a Ponzi scheme and whether or not he directed it. And I made that determination, and it is yes.
(TT.270. at 4/27/22)

90. The testimony that this was a Ponzi scheme, a Forex scheme, and that another U.S. District Court judge opined on the fraudulent nature of Oasis was improper under Rules 701, 702, and 704.

*Defense Counsel Failed To Object To The Receiver's Testimony That Introduced The Findings Of Another U.S. District Court That There Had Been Fraudulent Activity, Once Again, Usurping The Fact Finding Authority Of The Jury And Depriving Mr. DaCorta Of Effective Assistance Of Counsel*.

91. The receiver testified as to the alleged findings of the U.S. District Court in the civil proceedings with the CFTC, i.e. the CFTC Action, again, usurping the fact finding authority of the jury without objection from defense counsel.

92. The receiver testified that Judge Covington found that there was a Ponzi scheme or that there was fraud and that he was confiscating assets of Mr. DaCorta and Oasis based on the findings in the CFTC Action.

> Q What does it mean to serve as a receiver?
> A Well, a receiver can be many things. In mortgage foreclosures and things of that nature on a big building oftentimes when the parties are in dispute, the Court will appoint a receiver to manage the property until that is resolved. In this type of receiver, it's called a federal equity receivership. And in civil enforcement actions by regulatory agencies where they show to the Court that there is a business that is involved in fraudulent activities, oftentimes the relief, part of the relief they will seek is the appointment of a receiver.
> (TT.195 at 4/27/22)

93. This was a direct message to the jury that another court already found the conduct of DaCorta and Oasis to be fraudulent and ordered that Wiand confiscate their assets:

> Q And without getting into the details, what was your purpose in having this conversation with Mr. DaCorta?
> A My purpose was twofold or threefold maybe. It was, Number 1, to explain to him who I was and what my position was and to explain to him what my job was as receiver and what my authorities were. And I provided him a copy of the receivership order and went through that and talked to him about what it meant and that kind of thing, explained to him that with respect to the house and other assets that I now control those.
> (TT. 204)

94. The receiver testified that pursuant to a federal court order he confiscated all the real estate owned by Oasis:

> Q Mr. Wiand, did you go to any other locations on April 18 of 2019 in connection with your receivership duties?

> A I did not. I went -- after we left Mr. Duran's house, we went downtown. There were some other people from the CFTC who were there going to other houses and residences and an office. And we had lunch and a meeting there to talk about what we had seen and found.
> Q Were the other CFTC individuals in the area who went to the other residences, were they doing effectively the same thing you had done at Mr. DaCorta's residence and the house
> where Mr. Duran was living?
> A It's my understanding that's what they were doing, yes.
> (TT.207-208 at 4/27/22)

95. The receiver testified that a federal court ordered that all Oasis records be turned over to him.

> MR. WIAND: And the Court's order directs that all records be turned over to me. And any financial institution that has dealt with Oasis or related companies, that they were obligated to turn all of their records over to me also. So we bring in all of those records.
> (TT.211 AT 4/27/22)

96. The receiver testified that he sold off all the assets of Oasis with the approval of Judge Covington in the civil action:

> MR. WIAND: When I presented the price to the Court, then I present an average of the opinions of the real estate professionals, the sales price has to be within 30 percent of that. It can't be lower than 30 percent of that average opinion price. In this situation, everyone was over that price. And so then the Court evaluates that and approves it and then we close the transaction.
> Q Did you have to get three separate valuations from real estate professionals for every one of these properties?
> A Every one of them, yes, ma'am.
> Q And did you present all of that information to the Court?
> A It was all approved by Judge Covington.
> (TT. 224 AT 4/27/22)

97. The receiver further testified that he instituted legal actions against numerous entities to claw back money to the receivership. He obtained judgements and legal findings of fraud that settled for millions of dollars. (T.234-236 at 4/27/22). This was a direct message to the

jury that not only did a federal judge make a finding of fraud, but numerous other courts also made findings of fraud, usurping the fact finding authority of the jury.

98. The receiver testified as to the findings of Judge Covington:

> Q Well, there has been no finding in either the criminal matter or the civil matter that this was a forex scheme; isn't that correct? Judicial finding by a jury in either matter, correct?
> A I don't think a jury has found that, but I think you might find in some of Judge Covington's orders that the evidence presented to her, she made the determination that it was a Ponzi scheme.
> (TT.269 at 4/27/22)
>
> ---
>
> Q Okay. There has been no finding of guilt or innocence as to the allegations that are lodged against Mr. DaCorta as to whether or not he was involved in a scheme to defraud, correct? You don't get to decide whether or not Mr. DaCorta is guilty of a scheme to defraud, do you?
> A It's incumbent upon me in making my decisions as a receiver to determine whether or not this was a Ponzi scheme and whether or not he directed it. And I made that determination, and it is yes.
> (TT.270 at 4/27/22)

99. This testimony effectively precluded the jury from making any factual determination. The jury was presented with a finding of fraud by a federal court and numerous other courts according to the testimony of the receiver.

100. Mr. DaCorta was deprived of the right to effective assistance of counsel when his attorney failed to object to the opinion testimony and various court findings that there was a Ponzi scheme and that fraud had been committed.

*Mr. DaCorta Was Deprived Of Effective Assistance Of Counsel When His Trial Attorney Failed To Object To A Confrontation Clause Violation In The Receiver's Testimony.*

101. The receiver testified that he hired and relied on the findings of numerous experts during his tenure as receiver. For financial matters, he relied on the Kapila Accounting Firm, which tracked deposits, withdrawals, and the overall activity in Oasis accounts. He testified that

Kapila provided him with a report summarizing all of Oasis's financial operations. His testimony was that the Kapila Firm prepared a report for him with specific findings regarding the financial workings of Oasis.

102. The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. The Clause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom. The Clause bars the admission at trial of an absent witness's statements unless the witness is unavailable, and the defendant had a prior chance to subject the witness to cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177.

103. The Supreme Court has clarified that when an expert witness conveys the statements of an absent analyst as the basis for their opinion and those statements are relied upon for their truth, the Confrontation Clause is implicated. In *Smith v. Arizona*, the Court held that testimonial statements from an absent analyst, even if presented as the basis for an expert's opinion, are admitted for their truth and therefore require the opportunity for cross-examination. The Court emphasized that the Confrontation Clause bars the admission of such statements unless the defendant has had a prior opportunity to cross-examine the original analyst. *Smith v. Arizona*, 602 U.S. 779 (2024).

104. Just as in *Smith v. Arizona*, the testimonial nature of the report prepared by the Kapila Accounting Firm formed the basis for the opinion and factual assertions made by the receiver in his testimony. In fact, the report was prepared at the direction of Mr. Wiand where he asked the Kapila Firm to make certain analyses and conclusions. (See Exhibit A – the Kapila Report). The receiver's testimony was merely a regurgitation of the conclusions in the Kapila report.

105. The Kapila Report contains the same numbers testified to by Mr. Wiand, the same conclusions regarding beginning bank account balances, total credits/receipts, total debits and disbursements, and ending bank account balances.

106. Most importantly, the Kapila Report makes conclusions about the finances of Oasis. The Report does a Ponzi analysis and concludes that Oasis was a Ponzi scheme; the Report does an analysis of the Oasis trading accounts, a reconstruction of Oasis bank accounts, cash flow charts and makes conclusions and opinions. The conclusions and opinions contained in the Kapila Report are the same conclusions and opinions testified to by the receiver, except one, which the receiver left out of his testimony.

107. In footnote 27 of the Kapila Report at page 17, the forensic experts conclude that some lenders made more money than they put in. The Kapila Accounting Firm, preparer of the Report and consistent beneficiary of the Wiand receivership[2], does not state how many lenders made more money than they invested.

108. The receiver relied entirely on the information in the Kapila Report, and he testified as to the opinions of the expert forensic accountants. The report was prepared for litigation purposes, and it is testimonial evidence under a Confrontation Clause analysis. Mr. DaCorta had the right to Confront the author of the Kapila report – the person who made those findings, opinions, and conclusions – at trial and cross-examine them as is his right under the Confrontation Clause of the Sixth Amendment.

109. The receiver testified that he consistently hires the Kapila Accounting Firm:

> Q Did you, in carrying out your duties as a receiver, rely exclusively on Mr. Paniagua's accounting of the lender accounts?
> A No.
> Q What did you do?

---

[2] Mr. Wiand testified that he consistently hires the Kapila Accounting Firm to do forensic work in his receiverships. See pgs 217-218 at trial transcripts on 4/27/22.

> A Well, in order to determine with this kind of particular entity, relying on the records of this, you have to verify what you are seeing. I had the Kapila firm go through the bank account records and take all checks in, checks out to verify what money came in and what money went out in order to determine if these representations that you see here appeared reasonable.
> (TT.217 at 4/27/22)
> ---
> Q And you mentioned the Kapila firm; is that right? Who is that?
> A It is one of the premiere forensic accounting firms in the state and has a national reputation. The primary partner I deal with is a fellow named Soneet Kapila, and his staff.
> Q Were you able to determine how much money came into Oasis through the investors and lenders?
> A I believe it was something like $88 million.
> (TT.218 at 4/27/22)

110. The receiver relied on the Kapila Accounting Firm for all the numbers and forensic financial data in his testimony:

> Q Were the records that were collected by you and your team in this case, the civil case, voluminous?
> A Very much so.
> Q Did you hire any other individuals to provide any specific services?
> A Yes. In collecting this, the people I have spoken about so far were lawyers. A lot of this is collecting and analyzing the numerical and financial data with respect to this. And I have a couple of different companies that I use who are forensic accountants who are adept at helping me examine these schemes and pull together the information. In conjunction with me and under my supervision doing what I want to do, they go out and go through all of the bank accounts and all of this information and prepare information with reports that they collect. And I review them with them, and we put them together so that we have a picture of the financial activity and what took place relating to the Oasis International Group and all of its related entities.
> (TT.211-212 at 4/27/22)

111. The receiver's testimony concerning account analysis and funds present drew the same conclusions contained in the Kapila Report.

112. At page 3 of the Kapila Report it states: "The Receiver has asked KM to opine on: (a) Whether or not the scheme operated by the Oasis Entities had attributes of a Ponzi scheme; (b) The amount of funds invested into the scheme; (c) the amount of funds lost by investors in the

scheme; (d) Whether or not the revenue generated from forex trading was sufficient for the Oasis Entitles to pay investors the promised returns; (e) The False Profits paid by the Oasis Entities paid to the following individuals: Betsy Doolin, Bradly and Carrie Kantor, David Wilderson, Elizbeth McMahon, Joseph Martini Jr., Joseph Martini Sr., Offer Attia, and Timothy Hunte. (See Exhibit A – Kapila Report pages 3-4)

113. The Kapila Report, at page 4 goes on to give a stated opinion: OPINIONS: KM's opinions are as follows: (a) From November 2011 to approximately April 2019, the scheme operated by the Oasis Entities had the attributes of a Ponzi scheme; (b) The total funds the Oasis Entities raised from the investors was approximately $83.8 Million; (c) The amount of funds lost be investors was at least $53.4 million; (d) The revenue generated from forex trading was insufficient for the Oasis Entitles to pay the promised return to investors; (e) False Profits were paid to several individuals. (Exhibit A pg. 4).

114. The receiver's testimony repeated the findings in the Kapila Report: that this was a Ponzi scheme (TT.233, T.269, T.270 at 4/27/22); the receiver testified that the total funds raised from investors was approximately $80 million dollar range (TT.218, TT.245, TT.246); the receiver testified that the amount of losses was about $56 million (TT.246, T.249); the receiver testified that the revenue generated from forex trading was insufficient, i.e. a scheme (TT.269); the only thing that the receiver did not testify to that is contained in the Kapila Report was that there were profits paid to certain investors, described as false profits.

115. While the numbers that Mr. Wiand testified to at trial were slightly (very slightly) different than the numbers in the Kapila report that is because the report (Exhibit A) was issued six months before Mr. Wiand testified at trial and the numbers changed slightly as more claims came in and as money was clawed back.

116. Mr. DaCorta should have had the opportunity to cross-examine the forensic accountants that created that report on which the receiver relied to make opinions and conclusions.

POINT III

MR. DACORTA WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO CALL AN EXPERT WITNESS TO COUNTER THE TESTIMONY OF THE GOVERNMENT'S FOREX EXPERT.

117. Mr. DaCorta was deprived of effective assistance of counsel when his attorney failed to call an expert witness regarding Forex trading to counter the testimony of the Government's Forex expert.

118. The crux of the Government's case was that DaCorta had recklessly traded in the Forex area and lost large sums of money. According to the Government, the trading was so unprofitable that DaCorta was forced to pay the interest from the incoming loans, rendering Oasis a Ponzi scheme. The only expert witness regarding Forex trading was Mr. Childers. The failure to call an expert to counter his opinions deprived Mr. DaCorta of the right to effective assistance of counsel.

119. The opinion of the Forex expert that DaCorta hired, and who was available and waiting to testify at trial, is attached hereto as Exhibit C. The testimony that the jury would have heard counters all of the significant points made by Childers at trial. See Exhibit C – Sworn Affidavit of Abe Cofnas.

120. Courts have held that trial counsel's failure to call an expert may constitute ineffective assistance of counsel if the expert's testimony is critical to the defense and its absence prejudices the defendant. In *Ferensic v. Birkett*, the Sixth Circuit affirmed the district court's grant of habeas relief where the trial court excluded the defendant's eyewitness identification expert due to a discovery violation. The court emphasized that the entirety of the evidence against the

defendant was based on eyewitness identifications, and the expert's testimony would have provided critical evidence regarding the inherent unreliability of such identifications. The exclusion of the expert's testimony deprived the defendant of a substantial defense, undermining confidence in the trial's outcome. *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007).

121. In *United States v. Nolan*, the Second Circuit found trial counsel ineffective for failing to consult or call an expert to testify about the unreliability of eyewitness identifications under egregious circumstances. The court noted that the eyewitness identification was virtually the only evidence against the defendant, and an expert could have explained the unreliability of the identification due to medical trauma experienced by the eyewitness, which was beyond the understanding of typical jurors. *United States v. Nolan*, 956 F.3d 71 (2nd Cir. 2020).

122. The United States Supreme Court found that an attorney's performance fell below an objectively reasonable standard and was constitutionally deficient under *Strickland* when the defense attorney failed to seek additional funds to hire an expert witness. The Supreme Court saw this as unreasonable under professional norms. *Hinton v. Alabama*, 571 U.S. 263, 273 (2014).

123. The jury should have heard another expert's opinion to the investment and trading strategies of Oasis, especially where the company was profitable for 21 months of the time period in question. The assertion that the trading strategy of DaCorta was an illusion that took money from one pocket and put it in the other was a false assertion. The strategy, known as a straddle, has the potential for profitability, and was profitable for almost half the time.

124. The Government's Forex expert opinion was without question the most important and devastating testimony at DaCorta's trial. His opinions went uncontested.

125. Childers only testified about a couple of trades made at Oasis to support his opinion that the straddling was an accounting sleight of hand. The jury should have heard about

the straddling strategy and how it was profitable in many of the other trades made by DaCorta. (Exhibit C – Cofnas Affidavit).

126. Instead, DaCorta's Forex expert sat idly by his silent phone, prepared, but never called to testify.

POINT IV

MR. DACORTA WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO OBJECT AND MOVE TO PRECLUDE RULE 404(b) MATERIAL ADMITTED INTO EVIDENCE BY THE GOVERNMENT.

127. On three separate occasions during the trial, the Government called witnesses to testify as to other crimes, wrongs, or uncharged criminal acts alleged to have been committed by Mr. DaCorta. The Government did not provide reasonable notice of this testimony as is required under FRE Rule 404(b), and Defense counsel did not object. In each instance, the Government alleged that DaCorta committed some act, wrong, or uncharged crime that was similar to the charges in the indictment. The testimony had no probative value as to the crimes charged and was highly prejudicial.

*Rule 404(b) And The Rule Against Admission of Other, Crimes, Wrongs, Acts*.

128. The Eleventh Circuit has developed a consistent framework for analyzing the admissibility of evidence under Federal Rule of Evidence 404(b).

129. The Eleventh Circuit's Three-Part Test for Rule 404(b) Evidence: (1) The evidence must be relevant to an issue other than defendant's character; (2) There must be sufficient proof to allow a jury to find by a preponderance of the evidence that the defendant committed the extrinsic act; (3)The probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice, and must satisfy the requirements of Rule 403. *United States v. Smirnoff*, 382 F.Supp.3d 1278 (2019).

130. Defense counsel failed to object and failed to request that a curative instruction be given to the jury.

*The 404(b) Testimony*.

131. There were three instances of 404(b) testimony that were not objected to by defense counsel. First, was the testimony of Deborah Oremland, an attorney for FINRA. The Government introduced a CRD report of Mr. DaCorta through this witness (Exhibit 100A and 100B at trial). (T.69 at 4/19/22). The testimony was as follows:

> Q Are there any customer complaints listed in Exhibit 100A?
> A Yes.
> Q I would like to turn your attention to page 22 and focus on, it says "SRO Arbitration." Would this be a complaint lodged against Mr. DaCorta?
> A Yes.
> Q Generally, ma'am, what were the allegations?
> A Allegations were of fraud, breach of fiduciary duty, breach of contract, and negligence.
> (T. 74 at 4/19/22)

132. The document referred to in this testimony was from 2001 (T.72 at 4/19/22). It was so remote in time that it had no relevance to this case and no probative value; yet the allegations were identical to the allegations against Mr. DaCorta: fraud, breach of fiduciary duty, breach of contract, negligence. It was introduced as character evidence to show that DaCorta was accused of fraud in 2001, therefore, he must also be guilty of committing fraud in 2022.

133. Significantly, Ms. Oremland was not called to offer any other testimony.

134. Next, the Government called expert witness Jennifer Sunu. She testified that the NFA was considering disciplinary action against DaCorta based on deficiencies found in a 2009 audit of DaCorta's old company, ICT.

135. Sunu testified that the NFA entered into an agreement with DaCorta to forego disciplinary charges against him if he agreed to withdraw from NFA membership.

136. The Government had the witness read from Exhibit 111:

Q Ms. Sunu, just taking this -- let's take the top half of this. And can you just please read that to the jury?
A "Whereas, in 2009, NFA conducted an audit of International Currency Traders Limited, ICT, a Forex Commodity Trader Advisor, CTA, NFA member. Whereas, NFA is considering recommending formal disciplinary action against ICT and DaCorta based on the deficiencies found in the 2009 audit of ICT. Whereas, NFA would be willing to forego recommending formal disciplinary action against ICT and DaCorta if ICT would agree to withdraw from NFA membership and not reapply for registration as an NFA member, or act as a principal of an NFA member, at any time in the future; and DaCorta would agree to withdraw from NFA associate membership and as a principal of ICT and not reapply for registration as an NFA member or associate, or act as a principal of an NFA member, at any time in the future.

Now therefore, NFA does hereby agree to forego recommending formal disciplinary action against ICT and DaCorta, based on NFA's 2009 audit, and settle all issues arising therefrom."
(T.117-118 at 4/19/22)

137. Again, the allegations against DaCorta dated back to 2009 before DaCorta started Oasis. The allegations had no probative value to any of the elements of the crimes in this case.

138. Finally, the Government put forth testimony by Mr. Anile that DaCorta had falsified a customer statement, identical to the allegations in this case:

Q I'm not going to ask you what your brother told you, all right? Did you have a discussion with him about his concerns?
A Yes.
Q What, if any, action did you take based upon that discussion with your brother, Frank Anile?
A I called Michael, and I told him that he had apparently falsified a customer.
MS. IRVIN: Objection, Your Honor. Hearsay. This is based on the conversation that he says he had with his brother.
THE COURT: Well, he can relate his conversation with the defendant. So to that extent it's overruled.
BY MS. BEDKE:
Q So Mr. Anile, what did you tell the defendant?
A I told him that he had falsified a customer statement and that he wasn't allowed to do that. That's typically not done. He basically grossed it up or he added money back to the account that was not there. And he acknowledged that he knew that, and he told me he wouldn't do it again.
(T.125-126 at 4/25/22)

139. Anile's 404(b) testimony contained the exact same factual allegation that the Government was making against DaCorta in the indictment, i.e. that he was falsifying customer accounts. There was no probative value to this testimony because it was a completely separate incident that had nothing to do with the allegations in the indictment. There was no reason to bring this testimony from Anile other than to show propensity to commit the crimes alleged.

140. In all three instances, the 404(b) testimony was admitted without objection from defense counsel and without a request for a limiting instruction to the jury on these other crimes, wrongs, uncharged crimes, or bad acts.

## POINT V

## MR. DACORTA WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO OBJECT OR MOVE TO SUPPRESS THE VIDEO EVIDENCE ILLEGALLY OBTAINED BY THE FBI DEPICTING A PRIVATE CHRISTMAS PARTY THAT TOOK PLACE ON PRIVATE PREMISES.

141. Mr. DaCorta was deprived of effective assistance of counsel because his attorney neither raised in pre-trial motions nor objected at trial to the illegally obtained video and audio taken by an FBI agent at a Christmas party hosted by Mr. DaCorta. The FBI agent illegally and surreptitiously entered private property and recorded a speech made by DaCorta. That video was introduced into evidence, and no Fourth Amendment argument was made by defense counsel either prior to trial or during trial. Mr. DaCorta was denied the right to effective assistance of counsel when his attorney failed to move to suppress the illegally obtained video evidence.

*The Video Recording of DaCorta At The Christmas Party Constituted A Warrantless Search*.

142. In *Katz v. United States*, the Supreme Court established that the Fourth Amendment protects people, not places, and that what an individual seeks to preserve as private—even in a public or accessible area—may be constitutionally protected. *Katz v. U.S.*, 389 U.S. 347 (1967). The Court held that warrantless electronic surveillance of a public telephone booth

violated the Fourth Amendment because the petitioner had a reasonable expectation of privacy in his conversations, even though the surveillance involved no physical trespass ( *Katz v. U.S.*, 389 U.S. 347 (1967)) [3]. Similarly, in *Carpenter v. United States*, the Court reaffirmed that official intrusion into a private sphere generally qualifies as a search and requires a warrant supported by probable cause when the expectation of privacy is reasonable. *Carpenter v. United States*, 585 U.S. 296 (2018).

143. In *United States v. Jones*, the Court emphasized that the reasonable-expectation of-privacy test supplements, rather than replaces, the common-law trespassory test. A search occurs when the government physically occupies private property to obtain information, as this would have been considered a "search" under the Fourth Amendment at its adoption. *U.S. v. Figueroa-Cruz*, 914 F.Supp.2d 1250 (N.D. Ala. 2012).

144. In *Gennusa v. Canova*, the Eleventh Circuit held that warrantless electronic surveillance of attorney-client privileged communications violated the Fourth Amendment, emphasizing that the proper inquiry is whether the government's activities violated privacy upon which the participants justifiably relied. *Gennusa v. Canova*, 748 F.3d 1103 (11th Cir. 2014). This principle applies broadly to situations where individuals have a reasonable expectation of privacy in their communications or activities. See also *Berger v. New York*, 388 U.S. 41 (1967) holding that a trespassory intrusion into a constitutionally protected area violates the Fourth Amendment; *Silverman v. United States*, 365b U.S. 505 (1961) sticking a microphone into a constitutionally protected area to record conversations violated the Fourth Amendment.

145. Even in a public area, the Supreme Court has held that there is a reasonable expectation of privacy where attachment of a global positioning system to a vehicle constituted a search under the Fourth Amendment, and such a warrantless search violates the Fourth

Amendment. *United States v. Jones*, 565 U.S. 400 (2012). Even in the absence of a trespass, a Fourth Amendment search occurs when the Government violates the subjective expectation of privacy that society recognizes as reasonable. *United States v. Jones*, at 414.

146. Mr. DaCorta had a reasonable expectation of privacy at a private, invitation-only event that took place in a banquet hall where the doors were closed to outsiders, and only invited guests were present – it was a private party, and DaCorta had a reasonable expectation of privacy.

147. FBI Agent Stone trespassed on private property and crashed the party.

Q And did you do any undercover work in that investigation?
A Yes, I did.
Q What type of undercover work did you do?
A Initially I tried to submit an online request for information, found no success. That was with OIG. And then I transitioned to eventually attending a Christmas party at the Ritz-Carlton in Sarasota followed by in-person meetings or telephone calls or text messages.
Q And what year was that Christmas party in?
A That was December 1 of 2018.
(T.16 at 4/21/22)
---
Q And could you tell the jury about how you ended up attending that party?
A Yes. So originally I wasn't sure if the party was on a Friday or a Saturday. So myself and another undercover agent went to the Ritz-Carlton in Sarasota, Florida, on a Friday night. We learned after being in the lobby area and asking different people at the front desk, there was no party planned for OIG on Friday night but rather it was on Saturday night.
(T.17 at 4/21/22)
---
So, on Saturday night I returned with another FBI agent in a covert capacity. And upon arriving at the Ritz-Carlton, we could see that in fact there was a party planned.
Q What were you wearing?
A I was wearing a suit, dressed with a shirt and a necktie. This was what you would expect at the Ritz-Carlton. Everyone was dressed in attire that would be certainly suitable for what I would deem a high-end Christmas party.
(T. 17 at 4/21/22)
---
Q And did you have an invitation to that party?
A No, I did not.
(T.18 at 4/21/22)
---

Q And were you eventually able to get into that party?
A Yes.
Q And once you got into that party, did you speak to anybody?
A Yes, I did.
Q What was your cover story?
A So initially knowing that this was an event where you were invited, I originally just went up and talked to the photographer, believe it or not. And so I established a rapport with the photographer. And then once we were in and amongst others at the party, we just talked to the folks that were eating or drinking and exchanged pleasantries…
(T.18-19 at 4/21/22)
---
Q And as the night drew on, what happened next?
A As the guests went in to be seated at the table, clearly I did not have a seat at any of the tables. So during the formal dinner obviously they made their selections, their grouper or steak or whatever they were going to have just like you would think at a wedding reception, and folks were all seated at a table. So clearly I didn't have a seat. I didn't go inside the ballroom, but I overheard Mr. DaCorta speaking on a microphone. So I opened the door to hear what Mr. DaCorta was telling the mass of people, and I would estimate probably about 200 people roughly. And Mr. DaCorta was in front of where the band would be. They had a string band there. And Mr. DaCorta had a microphone, and at that time I started to record what Mr. DaCorta was saying.
(T.20 at 4/21/22)
---
Q And what have I handed you in 210A?
A There is a DVD. It's marked obviously Trial Exhibit 210A. It is initialed by me, J.R.S., and it is dated by me 4/20/22. And this represents the video recording that I took on the night of December 1 of 2018.
Q And so prior to coming in here and testifying today, did you initial that DVD?
A Yes, sir, I did.
Q And is the video recording on there a fair and accurate representation of what you observed and what you recorded at that Christmas party?
A Yes, sir.
(T.21 at 4/21/22)

148. Stone was on private property at a private event; it was invitation only; he wasn't invited. He was outside the dinner hall and opened the door to record what DaCorta was saying.

149. Stone was physically excluded, and he was trespassing into a private event without a warrant, violating a constitutionally protected space.

150. The opening of that door was a break and a search. When Stone opened that door into a private, invitation-only area and recorded video and audio, he violated the Fourth Amendment.

151. Invitations were handed out to include the desired guests, and to exclude others – others, like Agent Stone.

152. Defense counsel should have moved to suppress this video and any testimony by Agent Stone regarding the Christmas party, which the Government used over and over again at trial to demonstrate to the jury DaCorta's allegedly excessive lifestyle.

## CONCLUSION

Mr. DaCorta was deprived of the right to effective assistance of counsel under the Sixth Amendment and under *Strickland v. Washington*. In each instance, defense counsel's conduct fell below the professional norms required of defense counsel, and the outcome of the trial would have been different but for the sub-standard performance of defense counsel.

Dated: September 2, 2025
New York, New York

Stephen N. Preziosi, Esq.
48 Wall Street, 11th Floor
New York, New York 10005
212-960-8267